**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**September 2, 2005**

**PATRICK FISHER**
**Clerk**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

ADRIENNE ANDERSON,

      Petitioner,

v.

UNITED STATES DEPARTMENT
OF LABOR,

      Respondent,

-------------------------------------------

METRO WASTEWATER
RECLAMATION DISTRICT

      Intervenor - Respondent,

PACE 5-477; PAPER, ALLIED-
INDUSTRIAL, CHEMICAL AND
ENERGY WORKERS UNION,
LOCAL 5-477 (PACE),

      *Amicus Curiae*.

No. 03-9570

---

**Appeal from the United States Department of Labor**
**Administrative Review Board**

---

Lee Katherine Goldstein, Senn, Visciano, Kirschenbaum, P.C., Denver, Colorado
(Susan J. Tyburski, Boyle & Tyburski, Denver, Colorado, with her on the briefs),
for Petitioner.

Mary J. Rieser, Attorney, (Howard M. Radzely, Solicitor of Labor; Steven J. Mandel, Associate Solicitor; and Paul L. Frieden, Counsel for Appellate Litigation, United States Department of Labor, Office of the Solicitor with her on the briefs), Washington, D.C., for Respondent.

Joel A. Moritz, Richard P. Brentlinger, Robert J. Thomas, Inman, Flynn, Biesterfeld, Brentlinger & Moritz, P.C., Denver Colorado; Donn C. Meindertsma, Winston & Strawn LLP, Washington, D.C., filed an answer brief for Intervenor.

Donald S. Holmstrom, Denver, Colorado, filed an amicus curiae brief for Paper, Allied-Industrial, Chemical & Energy Workers Union, Local 5-477 (PACE).

---

Before **HARTZ, McKAY** and **O'BRIEN**, Circuit Judges.

---

**O'BRIEN**, Circuit Judge.

---

This is a whistleblower action brought by Adrienne Anderson (Anderson) against Metro Wastewater Reclamation District (Metro) pursuant to various environmental statutes which prohibit discrimination against "any employee or any authorized representative of employees." Pursuant to the recommendation of one of Metro's local unions, the City of Denver's mayor appointed Anderson to Metro's Board of Directors (Board) to represent the citizens of Denver. Anderson contends that during her tenure on the Board, Metro discriminated against her for speaking out against its plan to treat the effluent from the Lowry Superfund site on account of her belief that its effluent contained plutonium and other radionuclides which Metro was incapable of treating. Among other things,

-2-

Anderson alleges Metro discriminated against her by (1) ruling her out of order and cutting her off at Board meetings, (2) denying her requests to distribute materials to other directors and to hold a special Board meeting, (3) threatening her with censure, (4) accusing her of lying, (5) altering the Board's meeting minutes, and (6) leading a campaign to defame her and destroy her professional reputation.

We are called upon to determine whether Anderson, as a political appointee to Metro's Board, was an "authorized representative of employees" during her tenure as a Board director. The Administrative Review Board (ARB) of the United States Department of Labor (DOL)[1] concluded she was not and therefore determined she lacked standing to sue under the employee protection provisions of the environmental statutes.[2] We agree.[3]

---

[1] In 1996, the Secretary of Labor created the ARB to *inter alia* act for the Secretary in reviewing decisions of Administrative Law Judges pertaining to the environmental whistleblower statutes. 61 Fed. Reg. 19,978, 19,978 (May 3, 1996).

[2] All citations to the record in this case refer to the administrative record. Citations to Metro's Vol. I, II or III and Anderson's Vol. III-A, III-B or III-C refer to the volumes of exhibits which were introduced into evidence at the administrative hearing before Administrative Law Judge David W. Di Nardi.

[3] Six of the seven environmental statutes at issue in this case provide for judicial review of the ARB's decision in the Circuit Court of Appeals in which either the complainant resides or transacts business or where the environmental violation occurred. *See* 15 U.S.C. § 2622(c)(1), 33 U.S.C. §§ 1367(b), 1369(b)(1), 42 U.S.C. §§ 300j-9(i)(3)(A), 5851(c)(1), 6971(b), 6976(b), 7622(c)(1). However, one statute, the Comprehensive Environmental Response,

I. Factual Background

*Metro Reclamation District*

Metro was created in 1961 by the Metropolitan Sewage Disposal Districts Act, Colo. Rev. Stat. §§ 32-4-501-547, and is a political subdivision of the State of Colorado. It provides wholesale wastewater treatment to its members, which consist of over fifty municipalities and sanitation districts in metropolitan Denver. These members provide retail wastewater services to their constituents, approximately 1.3 million people.

Metro is governed by a policy-setting Board of Directors (Board). Individual directors are appointed for a two-year term by the chief executive officers of the

---

Compensation and Liability Act (CERCLA) vests exclusive jurisdiction in the federal district courts. 42 U.S.C. §§ 9610(b), 9613(b). The ninth circuit confronted a similar conundrum in *Ruud v. United States Dep't of Labor*, 347 F.3d 1086 (9th Cir. 2003), a case involving the Clean Air Act and CERCLA. It concluded:

> We hold that the court of appeals should entertain a petition to review an agency decision made pursuant to the agency's authority under two or more statutes, at least one of which provides for direct review in the courts of appeals, where the petition involves a common factual background and raises a common legal question. Consolidated review of such a petition avoids inconsistency and conflicts between the district and appellate courts while ensuring the timely and efficient resolution of administrative cases.

*Id.* at 1090. *See also Int'l Bhd. of Teamsters v. Peña*, 17 F.3d 1478, 1481-82 (D.C. Cir. 1994) (review of United States Federal Highway Administration's implementing rule). We agree and hold we have jurisdiction to review the merits of this case in its entirety.

member municipalities. The number of directors each member has on the Board is based on its population.[4]

The Board holds monthly meetings which are open to the public and run by a chairman. The Board follows Robert's Rules of Order and a majority vote is required for Board action. In addition to the directors, members of Metro's management team, including the District Manager and Metro's legal counsel, are present at the meetings. The meetings are tape-recorded and action minutes are prepared from those tapes. The tapes are destroyed once the minutes are approved by the full Board at the next meeting.

Metro has over 330 employees. Approximately 26-27 of those employees belong to the Oil, Chemical and Atomic Workers Union (OCAW)[5] and 140-145 belong to the International Union of Operating Engineers. In 1993, OCAW's collective bargaining agreement with Metro expired. Despite numerous negotiations, a new agreement was not reached until December 1997. Because of the lack of a contract, the relationship between OCAW and Metro was acrimonious in 1996-1997.

---

[4] During the relevant time period of this suit, the Board consisted of fifty-nine directors. The City of Denver, the largest municipal member, had twenty directors on the Board, including Anderson.

[5] Due to a merger in 1999, OCAW was succeeded by the Paper, Allied-Industrial, Chemical and Energy Workers Union (PACE). For purposes of this opinion, we will continue to refer to the union as OCAW. The union has filed an amicus curiae brief in support of Anderson.

*Metro's Treatment and Pretreatment Process*

Metro receives approximately 160,000,000 gallons of wastewater a day from its members. When the wastewater first enters Metro's treatment plant, large objects are screened out. The water is then placed into large settling tanks where heavy solids settle to the bottom. Bacteria and other micro-organisms are added to the waste water; these "bugs" eat the organic pollutants and nitrogen in the wastewater. To kill these "bugs," chlorine is added to the water; to remove the chlorine, sulphur dioxide is added. The treated wastewater, called wastewater effluent, is then discharged pursuant to a state permit into the South Platte River.

During the treatment process, solids, called sludge, are removed. Each day, Metro's treatment process produces well over a hundred tons of wastewater sludge. This sludge is placed into tanks where bugs digest a large quantity of it and disinfect the remainder. Once disinfected, this sludge, now called bio-solids, is applied as fertilizer to farmland in eastern Colorado, including Metro's own farmland.[6] Metro produces between 70 to 80 dry tons of bio-solids each day.

In addition to treating wastewater that comes to it from its members, Metro has a pretreatment program which regulates the wastewater it receives from industry. This program is mandated by the Clean Water Act and helps maintain the quality of

---

[6] In 1993, Metro began purchasing farmland in Arapahoe and Elbert Counties. In 2000, Metro owned 51,000 acres of farmland, growing wheat and other grains.

Metro's treatment process and its bio-solids program. Metro's pretreatment program requires industries, pursuant to the requirements of a pretreatment permit, to remove certain pollutants from its wastewater prior to sending it to Metro. In addition to limiting the pollutants that may enter Metro's treatment facility, these pretreatment permits contain monitoring and reporting requirements. Metro enforces these permits by issuing notices of violation, compliance orders, cease discharge orders and penalties; a failure to enforce these permits could result in action against Metro by the Environmental Protection Agency (EPA).

*Lowry Site and Settlement*

The Lowry site consists of 480 acres at the intersection of Quincy Avenue and Gun Club Road, approximately fifteen miles east of the City and County of Denver. From about 1940 to 1962, the United States Air Force utilized the Lowry site, as well as surrounding land, as a bombing range. From 1966 until 1980, the City of Denver operated part of the Lowry site as a landfill. Over 120 million gallons of liquid wastes were disposed of in waste pits at the Lowry Landfill. Approximately eight million tires and thirty-seven million gallons of sewage sludge were also disposed of at Lowry.

In 1984, the Lowry site was named a Superfund site.[7] It was estimated that it

---

[7] A site qualifies as a Superfund site and is placed on the National Priorities List when it is determined that "there may be an imminent and substantial endangerment to the public health or welfare or the environment because of an

would cost 4.5 billion dollars to clean it up. Over 400 entities were designated as "potentially responsible parties" (PRP) including Adolf Coors Company, Conoco Inc., Gates Rubber Company, Rockwell International (Rocky Flats Plant) and Shell Oil Company. In May 1988, Metro was named a PRP based on its application of sewage sludge at the site. Subsequently, the EPA issued two administrative orders requiring several PRP's, including Metro, to perform remedial investigations and feasibility studies on Lowry. Pursuant to these orders, Metro, along with several other PRP's, formed a coalition, called the Lowry Coalition, to study Lowry and determine how best to clean it up. Metro contributed over $4,700,000 dollars to demonstrate it was not a responsible party and to perform its obligations under the administrative orders. Its efforts to disprove its liability were unsuccessful. Based solely on the volume of sludge it applied to the Lowry site, Metro was considered a ten percent contributor, which exposed Metro to 450 million dollars in liability. Metro attempted to look to its general liability insurance carriers but they denied coverage, eventually leading to litigation between Metro and its insurers in 1988-89.

In 1994, the City and County of Denver, Waste Management of Colorado and Chemical Waste Management, the owners/operators of the Lowry Landfill, sued Metro and several other PRP's in the United States District Court for the District of Colorado seeking contribution to the costs they were incurring in cleaning up

_____

actual or threatened release of a hazardous substance. . . ." 42 U.S.C. § 9606(a).

Lowry. In early 1996, as trial was approaching, the parties began settlement negotiations. Denver, Waste Management and Chemical Waste Management initially sought $30-35,000,000 to settle the matter with Metro. However, the parties eventually reached a settlement in June 1996, which required Metro to: (1) pay $1,900,000; (2) contribute $400,000 to the construction of a sewer line from Lowry to the City of Aurora's wastewater system; and (3) treat the effluent from the Lowry Landfill pursuant to the terms and conditions of a pretreatment permit. Under the treatment portion of the agreement, called the Publicly Owned Treatment Works (POTW) treatment option, Lowry's wastewater would be pretreated at the site pursuant to a pretreatment permit, discharged into the City of Aurora's public sewer system and Metro's Sand Creek sewer, and then sent to Metro's facility for further treatment. If at any time the Lowry effluent failed to satisfy the standards set forth in the permit, discharge to Metro would be stopped.[8] Metro's Board unanimously approved the settlement at a special meeting on June 4, 1996.

*Anderson's Appointment to the Board*

In late 1995, seeking the appointment of a director sympathetic to OCAW's views, Patricia Farmer and Marilyn Ferrari, OCAW Local's Chief Steward and Vice President, respectively, contacted Paul Wishard, the labor liaison for Wellington

---

[8] Indeed, in late 2000, Metro stopped the discharge because the effluent failed a test required by the permit.

Webb, then-mayor of the City of Denver. Wishard suggested they submit the names and resumes of individuals they wished to see appointed to the Board. Thereafter, Ferrari called Anderson, asking her whether she would be willing to serve as a director on the Board.[9] Anderson agreed and her name and resume were submitted for Mayor Webb's consideration.[10] On February 22, 1996, Mayor Webb sent

---

[9] In the 1980's, Anderson had served as a consultant to OCAW International. In 1994, she served as Special Projects Director for OCAW International in which she assisted the local union at Metro with its health and safety concerns and lack of a contract. Due to pregnancy complications, Anderson left this position.

[10] In her letter to the Mayor's office in which she submitted Anderson's resume, Farmer stated:

> Please accept the enclosed resume of Adrienne Anderson in consideration for the open position on the [Metro] Board of Directors. Ms. Anderson is a recognized expert on environmental issues and is well versed on matters regarding the Lowery [sic] Landfill. Considering [Metro's] position to force the City and County of Denver into litigation rather than live up to [its] obligation to clean up the landfill, it seems appropriate that someone be appointed . . . who will hold [Metro] management accountable on this matter. Ms. Anderson has also been helpful to [Metro] employees . . ., who are represented by [OCAW], in their fight for a fair contract. These employees have been working under an expired contract for three years while [Metro] management refuses to bargain with the union over any meaningful contract issues.
>
> As a representative for the Metro OCAW bargaining unit, I have spoken with Mayor Webb . . . about our struggles. The majority of our members are taxpayers in the city of Denver and we believe the Denver Directors have a duty to represent the citizens of this city. We hope the appointment of Board members like Adrienne Anderson will lead to a kinder and gentler District management who will put people and the environment first.

Anderson a letter appointing her to the Board through June 30, 1998. The letter informed Anderson her appointment would need to be confirmed by the Denver City Council and would take approximately one month to process.

Prior to her confirmation hearing, Anderson, believing she needed to "get up to speed on outstanding issues that the union had expressed concern about," began reviewing public records concerning Lowry. (Tr., Nov. 7, 2000 hearing, Vol. II at 274.) Through this initial research, she discovered the United States Army Corp of Engineers had designated the Lowry site as a catastrophic risk zone, meaning "the chance of somebody being injured or killed was high, by going out to that territory." (*Id.*) Because she believed the public was unaware of this and because the building of subdivisions was being planned for the area, Anderson wrote to then-Colorado Governor Roy Romer expressing her concern. She also appeared on a Denver radio talk show program to alert the public to the information she had discovered and to urge full radiological testing be performed at Lowry.

*Confirmation Hearing*

In May 1996, Anderson appeared before the Public Works Committee of the Denver City Council. At the hearing, Donna Good from Mayor Webb's office sought the Committee's confirmation of Anderson as a Metro director and informed the Committee her appointment had been made pursuant to OCAW's

---

(Anderson's Vol. III-A, Ex. 4.)

recommendation. After Anderson answered the committee's questions, she was informed her confirmation would go before the full city council at its next weekly meeting. Anderson expected to be on the Board by June. However, at the next city council meeting, Councilman Ted Hackworth, also a Metro Board director, raised objections to Anderson's confirmation and wanted to personally question her. Therefore, in June 1996, Anderson appeared again before the Public Works Committee.

There, Hackworth questioned Anderson's association with OCAW and environmental groups. As to her union association, he questioned whether it presented a conflict of interest. Anderson explained her past associations and informed Hackworth her position on the Board would be to craft solutions which are protective of worker health and safety but also cost effective. Satisfied with her answers, Hackworth voted for Anderson's confirmation and she was unanimously confirmed by the entire City Council.[11]

---

[11] Anderson's official appointment paper, signed by Mayor Webb on July 8, 1996, stated:

> I, Wellington E. Webb, Mayor of the City of Denver, Colorado, by virtue of the authority vested in me by law, do hereby appoint Adrienne Anderson as the City of Denver's representative on the Board of Directors of Metro Wastewater Reclamation District, to serve a term of two years . . ., beginning July 1, 1996, and ending June 30, 1998, in accordance with the laws of the State of Colorado and the By-laws of the Metro Wastewater Reclamation District.

*Anderson's Research Prior to First Board Meeting*

Before attending her first Board meeting as a director, Anderson received a package of introductory materials and the meeting agenda. She noticed an item on the agenda was the approval of approximately $100,000 in attorneys' fees related to Lowry.[12] Also prior to her first meeting, Anderson had lunch with then-Chairman of the Board, Richard Plastino, who informed her of the Lowry settlement and what it generally entailed. Thereafter, she continued her research on Lowry, discovering that Metro had at one time refused to accept the Lowry effluent and that radioactive waste had been disposed of at the site.

*Anderson's First Board Meeting*

On July 16, 1997, immediately preceding her first Board meeting, Anderson attended a dinner with the Denver directors at Gaetano's restaurant. Anderson brought with her some documents she uncovered in her research which indicated the presence of radionuclides at Lowry. She informed the other directors of her concerns and offered to share the documents with them. One of the directors, John Wilder, became very angry and (according to Anderson) slammed down his fork and

(Metro's Vol. II, Ex. 30.) Anderson testified she believed the "odd" delay in her confirmation to the Board was to prevent her from being on the Board at the time it approved the Lowry settlement, what she refers to as the "secret deal[]." (Tr., Nov. 8, 2000 hearing, Vol. III at 589-90, 591.)

[12] This attorneys' fee request related to the litigation between Metro and its insurance carriers.

yelled at her. Thereafter, Wilder, Hackworth and Robert Werner allegedly stood up and left.[13] Directors Al Levin and Steven Foute, also a new director, were shocked at the treatment Anderson received. Director Foute informed them he would make a motion at the Board meeting to have the EPA brief the Board on the Lowry treatment plan.

Later that evening, at the Board meeting, Anderson was sworn in as a director. District Manager Robert Hite testified that when Anderson introduced herself, she stated she was there to correct the mistakes they were making at Lowry and that if she had been on the Board, the Lowry settlement would never have been reached. Director Levin recalled Anderson introducing herself and indicating she was appointed by the Denver City Council and Mayor's office to represent the concerns and welfare of Metro employees. Chairman Plastino testified Anderson informed everyone she was appointed to represent environmental interests. Other individuals present at the meeting testified they thought Anderson was arrogant and aggressive, especially considering she was a new director. Anderson did not recall making any introductory statements at her first meeting. However, she did perceive a cool attitude towards her by certain Board members.

As planned, Director Foute moved to have the EPA brief the Board on Lowry

_____

[13] Hackworth testified he never attended any dinner where Anderson was present.

and Anderson seconded the motion. According to Anderson, Chairman Plastino stated such briefing was unnecessary because Metro staff could provide such information.[14]

*Anderson's First Operations Committee meeting*

Anderson was appointed to serve on the Board's Operations standing committee.[15] At that time, Hackworth was the committee's chairman. At her first Operations committee meeting on August 8, 1996, Anderson felt the same cool reception towards her that she had felt at her first Board meeting. During the meeting, Anderson requested to go into an executive session in order to discuss the information she had discovered in her research regarding Lowry. Allegedly, Hackworth angrily banged his gavel and ruled her out of order. Hackworth testified

---

[14] Although Anderson testified Foute made this motion at her first Board meeting, the meeting minutes show this motion was not made until her second Board meeting on August 20, 1996. The minutes also reveal Plastino stated he was open to having the EPA and Colorado Department of Health speak directly to the Board but wanted Metro personnel to initially sponsor an informational meeting. Hite stated he was willing to commit Metro's staff to "all the time it takes to bring everybody up to speed" on Lowry. (Board's Aug. 20, 1996 meeting minutes at 14.)

[15] The Board has four standing committees: (1) Future Programs, (2) Operations, (3) Budget/Finance and (4) Personnel. Each of these committees has its own chairman and holds monthly meetings. The Board also has an Executive committee which is composed of the four officers of the Board (Chairman, Chairman Pro Tem, Secretary and Treasurer), the chairpersons of each standing committee, and five other members appointed by the Board's chairman. Except for the Executive committee, which has limited spending authority, these committees may only make recommendations to the full Board; they may not take action on behalf of the Board.

he merely informed Anderson the Lowry decision had been made by the Board and therefore it was inappropriate to discuss it further.[16]  After that meeting, Anderson learned that at the prior month's Operations committee meeting, Hackworth had told another director that Anderson had lied at her confirmation hearing.  In response to hearing this, Anderson wrote Hackworth a letter, seeking an apology.  Hackworth replied to the letter, indicating he merely told the other director that if Anderson represented OCAW or environmental extremists, then she had lied to him at her confirmation hearing.

*August 20, 1996 Board Meeting*

On August 20, 1996, Don Holmstrom, then-President of OCAW Local, wrote a letter, with Anderson's assistance, to Marc Herman of the EPA, requesting a public comment period be held on the decision to have Metro treat the Lowry effluent.  On that same date, employees of Metro's laboratory and members of OCAW conducted an informational picket at the Board meeting, distributing Holmstrom's letter.  The next day, Plastino telephoned Anderson, informing her he had received a number of calls from other Board members concerning their belief that she was a "whacko" and that she had told the employees about the Lowry settlement.  He also informed her they were concerned about her having conducted a

---

[16] This incident is not addressed in the August 8, 1996 Operation committee meeting minutes.  Anderson refers to this omission as an example of Metro's falsification/alteration of Board minutes.

Colorado Open Records Act (CORA) request while representing herself as a Board member. Anderson admitted she had told the workers about Lowry, reminding Plastino she had been put on the Board to represent the workers, and stated she had made CORA requests in an effort to educate herself about Lowry.

*Anderson's Appearance at EPA Public Hearing*

The EPA issued its Record of Decision (ROD) concerning the clean-up of Lowry on March 10, 1994. The 1994 ROD called for onsite treatment of Lowry's wastewater. Because Metro's agreement to treat the Lowry effluent offsite altered the 1994 ROD, the EPA issued an "Explanation of Significant Differences" and held a public comment period from March 24, 1997, to April 22, 1997. On April 2, 1997, Anderson attended a public comment hearing held by the EPA.[17]

There, Anderson spoke, introducing herself as follows:

> My name is Adrienne Anderson. I'm a [B]oard member of the Metro Wastewater Reclamation District appointed by Mayor Webb of Denver, which owns the landfill, and I also teach environmental ethics at the University of Colorado at Boulder.

(Metro's Vol. I, Ex. 2 at 35.) During her comments, Anderson noted several times she was a Board member and called for rejection of Metro's proposed treatment of the Lowry effluent, claiming it contained plutonium and other radionuclides.

---

[17] Prior to attending this public hearing, Anderson had informed the Operations committee that she was conducting an extensive review of the Lowry matter and would be making public statements concerning her findings.

Director Al Levin also appeared at the hearing, voicing his concerns.[18]

Thereafter, on April 9, 1997, Plastino issued a memo to the Board's directors. In this memo, he indicated two directors had spoken out against Metro's plan to treat the Lowry effluent. While recognizing that the two directors did not claim to be speaking on the Board's behalf, Plastino stated "they failed to make a disclaimer that they were not speaking for or representing the Board." (Metro's Vol. I, Ex. 4.) He stated that while every director has the right to voice his or her opinion, the Board's by-laws provide that the chairman shall be the general spokesperson for the Board and every director has the obligation to state he or she is not speaking on behalf of Metro or the Board. To avoid further misrepresentations and to correct any misrepresentation that may have resulted, Plastino urged the Board to adopt a proposed resolution reaffirming its position on Lowry and the by-laws' designation of the chairman as the Board's spokesperson.

At the next Board meeting on April 15, 1997, discussion was held on Plastino's proposed resolution. Anderson objected to the resolution. She stated she

---

[18] Levin introduced himself as follows:

My name is Al Levin. I'm a director at the Metro Wastewater Reclamation Agency. And I'm here as a concerned citizen, concerned with the health, safety and welfare of everybody that is here today and the community at large.

(Metro's Vol. I, Ex. 2 at 50.)

-18-

clearly expressed at the EPA meeting that she held a minority position on the Board and did not represent the Board. She further expressed her concern that the Lowry waste stream included plutonium and neither the Lowry on-site treatment plant nor Metro's treatment facility had the capability of removing radionuclides. She then moved to amend the resolution to include language that the Board was fully informed that the Lowry waste stream contained plutonium and other man-made radionuclides. Her motion failed. Plastino's proposed resolution passed with only two "no" votes, one of which was cast by Anderson, with the caveat that she did support the by-law's designation of the chairman as the Board's spokesperson.

The next day, Plastino issued a letter to Anderson and Levin, indicating the full Board had passed a resolution re-affirming its position on Lowry and the by-laws' designation of the chairman as general spokesperson for the Board.[19] Plastino also informed them that if they continued to express their personal opinions related to Metro without giving a proper disclaimer, "there [was] a potential that the Board . . . will censure you." (Metro's Vol. I, Exs. 6, 7.) Anderson testified she interpreted this letter as "an attempt at intimidation. That they were attempting to curb my rights to speak out on this. I was upset that they were trying to isolate me further on

---

[19] This letter, referred to as the April 16, 1997 letter, was also sent to Hite, the Executive committee and Joel Moritz, Metro's legal counsel. Contrary to Anderson's assertions during the administrative proceedings, it was not circulated to the entire Board.

the Board . . . and I felt trivialized, that I would be subject to a letter telling me what I should say. I felt that [they were] treating me like a child. . . ." (Tr., Nov. 7, 2000 hearing, Vol. II at 366.) In response to Anderson's belief that she had made a proper disclaimer, Plastino issued another letter to her on May 20, 1997, informing her he did not believe she made a proper disclaimer and suggesting one for her.[20]

*May 1997 Board Meeting*

Before the May 1997 meeting, Director Levin provided Anderson with a memorandum which Hite allegedly circulated to all of the Board's directors except Anderson. Attached to this memo was a verbatim transcript of an interview Anderson conducted on a Boulder radio station on May 14, 1997, concerning her belief that Metro's treatment of the Lowry effluent would result in plutonium-laced biosolids being used as fertilizer in eastern Colorado. Anderson interpreted the memo as a "way for [Hite] to attempt to get the [B]oard concerned and upset about

---

[20] Plastino suggested the following disclaimer:

> I would like to state that I am not speaking on behalf of the Metro
> Wastewater Reclamation District, and the views expressed are my
> own personal opinions and not those of the Metro District.

(Metro's Vol. I, Ex. 10.) Plastino was instructed by the Executive committee to draft this letter. Prior to receiving it, Anderson became aware Plastino would be issuing the letter and made a motion at the May 20, 1997 Board meeting that any issue concerning disclaimers should be referred to the By-Laws Review committee. Plastino refused to entertain the motion, preferring to answer any questions once the letter was issued.

the fact that I was continuing to speak out on [the Lowry] issue." (Tr., Nov. 8, 2000 hearing, Vol. III at 439.) On May 30, 1997, Hite also sent a letter to Denver Councilman William Himmelmann concerning the campaign "being waged by a small number of people" against Metro's proposal to treat the Lowry effluent. (Anderson's Vol. III-A, Ex. 55 at 1.) Attached to the letter was a fact sheet addressing several specific allegations and the scientific and factual information countering them. This fact sheet was distributed to the Board at the May 1997 hearing; Anderson claims she was not allowed to distribute material at this same meeting.

*The "Smoking Gun"*

In June 1997, Anderson uncovered a letter from the Lowry Coalition, dated December 13, 1991, to the EPA Director of Region VIII, in which it objected to the EPA reaching any type of settlement with the Department of Energy or any other entity associated with the Rocky Flats Plant regarding Lowry because "[t]he information and data . . . demonstrates that man-made radionuclides which only could have originated from the Rocky Flats Plant are present in significant quantities at Lowry Landfill." (Anderson's Vol. III-A, Ex. 28 at 1.) The information concerning the presence of man-made radionuclides at the Lowry site was based on a study Harding Lawson Associates had performed at the site. Upon learning of the document, Anderson informed members of OCAW staff; they were

shocked and outraged. Thereafter, Anderson and the OCAW held a news conference at the Metro plant site concerning the Lowry Coalition's December 13, 1991 letter, which was later referred to as "the smoking gun" during the administrative proceedings. (Tr., Nov. 8, 2000 hearing, Vol. III at 453-54.)

*June 1997 Board Meeting*

At the June 17, 1997 Board meeting, the Board suspended the rules to allow for a public forum. During this forum, residents from eastern Colorado and representatives of OCAW appeared. In addition to voicing concerns about Metro's proposed treatment of the Lowry effluent, individuals raised concerns regarding Metro's non-tax paying status, erosion, and the deterioration of the roads used by Metro's trucks. Metro's management briefly responded to these concerns at the forum and followed up with a more detailed letter dated June 27, 1997.

*Anderson's Request for Special Meeting*

On June 25, 1997, Anderson authored a letter to Beverly McAdam, Metro's staff assistant, seeking a special Board meeting. She asked McAdam to mail out her request for a special meeting and a packet of materials to all Board members. This packet of materials contained evidence that the Lowry site contained plutonium (including the December 13, 1991 Lowry Coalition letter) and information she had received from two employees who accused

-22-

Metro of blackmail.[21]  This information was mailed out to all directors.  Enclosed with the mailing was a memorandum issued by Chairman Plastino, stating that as chairman he would not be calling a special meeting and would recommend against such a meeting.[22]  Plastino testified he recommended against holding a special meeting because he believed it was unnecessary as the Lowry issue had already been settled by the Board.  Because it failed to garner the necessary support from the other directors, Anderson's request for a special meeting was denied.  Based on this denial, Anderson drafted a letter concerning her allegations and attempted to distribute it at the July 1997 Board meeting.  Her attempts to pass it out were not well-received.  Anderson alleges directors threw it in the trash and one director

---

[21] These two employees, Delwin Andrew and Anthony Broncucia, were terminated in 1997, along with two other individuals, for falsification of records (falsely punching time cards for other employees) and dishonesty.  They contacted Anderson believing she could assist them in getting their jobs back because they had heard Anderson represented the workers.  They informed Anderson that Metro had offered to reinstate two of the four fired employees if their union, the International Union of Operating Engineers, would endorse Metro's treatment of the Lowry effluent.  Hite admitted that Jose Padilla, a member of Metro's Human Resources Department, had approached Jim Smolynsky, the Business Agent for the Operating Engineers' Local Union at Metro, with a "deal" whereby two of the four terminated employees would get their jobs back if the Operating Engineers wrote a letter to the EPA supporting Metro's position on Lowry.  Hite testified Padilla acted without his knowledge and was orally reprimanded.

[22] The Board's by-laws state: "Special meetings shall be called by the Chairman of the Board, whenever, in his opinion, such a meeting is necessary or desirable, or whenever the same is requested in writing by 20 percent or more of the members of the Board." (Metro's Vol. I, Ex. 1 at 2.)

stated "I never read anything she distributes" and "[s]he can go to hell."[23] (Tr., Nov. 8, 2000 hearing, Vol. III at 484.) She claims no one censured this director and in fact, Hite laughed.

*Anderson's Tape-Recording of Meetings*

At the July 3, 1997 Operations committee meeting, Anderson brought a tape recorder and attempted to record the meeting. Hackworth made her turn off the recorder. A general discussion was had and a vote was taken, the majority opposing Anderson tape-recording the meeting.

On July 15, 1997, Anderson issued a memorandum to Hackworth alleging certain errors and misrepresentations in the July 3, 1997 Operations committee meeting minutes including the omission of her request for a roll call vote on whether she could record the meeting and Hackworth's refusal to hold such vote. At the next Operations committee meeting in August, Hackworth addressed the memo, reiterating that meeting minutes are not verbatim. After discussing the alleged distortion of the July 3 meeting minutes, the majority of the committee voted not to amend them. At this meeting, there was also discussion concerning the recording of meetings. Hackworth stated the By-Laws Review committee would be

---

[23] There was also testimony that Anderson, with Ferrari's assistance, had attempted at other meetings to pass out documents. Allegedly, directors threw these documents at Anderson. Both Ferrari and Anderson admitted they did not have permission to distribute these documents during the meeting.

addressing the tape-recording of meetings. In any event, Anderson was allowed to tape record the meeting.[24] On December 16, 1997, the by-laws were amended; the amendments contained a specific provision that meetings could be recorded.

*Anderson's CORA request*

On July 9, 1997, Anderson made a CORA request to Metro regarding whether Metro was receiving wastes from any other Superfund sites. Anderson testified she asked for this information because the workers had concerns about it. She stated she felt she had to obtain this information through CORA because she did not believe Metro would have voluntarily provided her with the information based on the reactions she received at meetings. On July 11, 1997, Betty Anne Trampe, Metro's Records Management Administrator, responded to the request, indicating Metro was currently receiving wastes from two Superfund sites. Trampe informed her documents concerning those sites would be available for her to review and copies would be provided to her "upon payment of 25 cents per page, consistent with the provisions of [CORA]." (Anderson's Vol. III-A, Ex. 74.) Anderson stated other directors did not appear to have to pay for copies and Metro could have

---

[24] Anderson subsequently did a CORA request to listen to the tapes of certain meetings of committees of which she was not a member. She listened to a By-Laws Review committee meeting and an Executive committee meeting. She claimed that during both meetings there was a discussion about how to prevent her from being able to tape record future meetings. Allegedly, these committees admitted they would not object if anybody else was tape-recording meetings but were concerned about Anderson taping them.

responded to her request stating she had a right to the documents without having to proceed through CORA. She also testified Hite joked about the fact Metro was billing her for copies.[25]

*"Public Relations War"*

After over a year of the Board refusing to listen to her, Anderson took her opposition to Metro's treatment of the Lowry effluent and her beliefs that plutonium and other radionuclides were present at Lowry directly to the media. Between April 23, 1997, and July 24, 1997, she was quoted in several Colorado newspapers, including the Colorado Daily, the Boulder Weekly, the Boulder Daily Camera and the Westward, as well as in In These Times, a national publication based in Chicago, Illinois. In June 1997, Anderson was interviewed by Moneyline, a CNN television program, for an investigative series concerning the EPA's policy allowing sewage sludge to be used as fertilizer. As part of that series, Moneyline focused on Metro's plan to treat Lowry's wastewater and to use the resulting sludge as fertilizer

---

[25] Hite testified Anderson had asked him for information concerning whether Metro treated other Superfund site waste at the July 3, 1997 Operations committee meeting. Hite informed her it did. When Anderson asked for records concerning those sites, Hite stated he would make them available for her. Before he was able to retrieve the records from archives, he received Anderson's July 9 CORA request. Because Anderson made a CORA request, Hite was required to treat her request like any other CORA request by a citizen, including charging her for it. He admits he "joked around" about having to charge her. (Tr., Nov. 16, 2000 hearing, Vol. VII at 1412.) He testified that had she allowed him to comply with her initial request, he would have provided her the information free of charge.

in eastern Colorado. Anderson videotaped this series and presented it to her students at the University of Colorado,[26] Metro employees, OCAW members and the public.

In response to Anderson taking her concerns public, Metro began its own "campaign" to defend its position on Lowry by issuing fact sheets, news releases and letters to the community to educate it about Lowry.[27] In addition to distributing his May 30, 1997 letter to Councilman Himmelmann to the media, Hite authored a letter on July 23, 1997, to "Interested Parties," including OCAW officials, government officials, Metro employees and eastern Colorado residents, addressing the December 13, 1991 Lowry Coalition Letter. In this letter, Hite stated that a report by Doty & Associates, dated August 10, 1992, refuted the findings by Harding Lawson Associates of the presence of radioactivity at Lowry. Specifically, the Doty & Associates report questioned the science and validity of the Harding Lawson Associates' findings and indicated radionuclides "are, at best, questionably present, and more likely not present at the Lowry Landfill above 'background'

---

[26] During her tenure on the Board, Anderson was an instructor in the Environmental Studies Program and Ethic Studies Department at the University of Colorado.

[27] Metro's Public Information Officer, Steve Frank, testified he and Metro management decided to take a "low key" approach in response to Anderson's statements to the media. (Tr., Nov. 14, 2000 hearing, Vol. V at 890.) He stated: "Basically, what [we decided] to do is talk about the facts. We [were] not going to talk about her. We [were] not going to use her name." (*Id.*)

levels." (Metro's Vol. II, Ex. 43 at 1) (quotations omitted).  Metro also sent a memorandum to Colorado Water Quality professionals alerting them to the Moneyline program.  In this memorandum, Metro asserted its proposed treatment of the Lowry effluent was protective of the public health and environment.  It also discounted Anderson's belief that plutonium was present at the Lowry site, stating "[s]he is not telling the truth, but she is getting her message to the media." (Anderson's Vol. III-A, Ex. 108.)

*EPA Approves Lowry Plan*

On October 28, 1997, Metro issued a press release informing the public that the EPA had approved Metro's plan to treat the Lowry effluent.  In this release both Hite and Steve Pearlman, Director of Metro's Regulatory & Connector Relations Department, stated the plan would pose no risk to the public or environment.  The Colorado Department of Health also gave its approval.

*Anderson's Failure to be Re-Appointed to the Board*

During the remainder of her term on the Board, Anderson continued to speak out, both publically and at Board meetings, against Metro's plan to treat the Lowry effluent.  Anderson's appointment to the Board expired in June 1998.  Anderson sought reappointment but Mayor Webb did not reappoint her.  Anderson believed her failure to be reappointed was due to her having unveiled the Lowry plan to the public and her rejection of it.  After not being reappointed to the Board, Anderson

was retained by OCAW Local as a part-time consultant to continue to work to block the Lowry plan. In May 1998, OCAW presented Anderson with an award in recognition for her work on behalf of Metro workers.[28]

*July 1999 Lowry Pretreatment Permit*

Once the Lowry settlement was reached, Pearlman and other individuals in Metro's pretreatment department began to develop a draft pretreatment permit for the Lowry site. On November 13, 1998, Metro issued its draft permit which limited fifty-three chemicals and fifteen radionuclides. It also imposed monitoring requirements on the Lowry operators, including the monitoring of pollutants not limited by the permit in the event they became present. Metro was also to monitor all parts of the Lowry treatment plan eight times a year. Metro accepted public comments on the draft permit for thirty days. After receiving comments from forty-three individuals and groups, including Anderson, Metro published a responsive summary in June 1999. As a result of the public's comments, Metro made thirteen changes to the permit, the most significant being a substantial lowering of allowable radionuclides Metro would receive from Lowry.[29] The final permit was issued on

---

[28] Earlier, OCAW International had provided Anderson with $5,000 to assist her in her whistleblower proceedings in gratitude for her "persistent dedication" in looking out for the interests of OCAW-Local as a Board member. (Anderson's Vol. III-A, Ex. 71.)

[29] Pearlman testified that the risk associated with radionuclides is their potential to cause cancer in humans. Pearlman stated that the EPA's allowable standard of radionuclides in drinking water is "a level that allows one additional

July 14, 1999, effective August 1, 1999. However, Metro did not begin to treat the Lowry effluent until July 2000.

*April 2000 Press Conference*

On April 14, 2000, OCAW sued Metro and others seeking an injunction "on behalf of the lab employees of [Metro] who are represented members of [OCAW]" against Metro's plan to treat the Lowry effluent. (Anderson's Vol. III-A, Ex. 93.) On April 18, 2000, OCAW held a news conference at the Metro facility which Anderson attended.[30] Steve Frank, Metro's Public Information Officer, testified he first learned of the conference when individuals from the media appeared in Metro's lobby inquiring about it. Frank stated no permission was either sought or given to hold the conference. He admitted he was angry and confronted Anderson, informing her she had no permission to be there. Nevertheless, Anderson continued to hold the press conference.

On April 26, 2000, twenty-one Metro laboratory employees belonging to OCAW authored a letter to OCAW Local President James Gilman, informing him

cancer case per million of population over a 70 year life time." (Tr., Nov. 15, 2000 hearing, Vol. VI at 1158.) He stated the draft permit established a limit for plutonium ten times more restrictive than the EPA standard for drinking water. Due to public concern, the final permit limited plutonium to allow for a cancer risk of one in one billion over a seventy year life time.

[30] James Gilman, President of OCAW Local at the time of the press conference, testified OCAW's lawsuit against Metro was filed in February 2000 and the press conference took place in March 2000. However, according to a statement Gilman made on April 19, 2000, OCAW sued Metro on April 14, 2000.

they were unaware of the litigation filed on their behalf to enjoin Metro's treatment of the Lowry effluent until they read about it in the newspaper. They further stated they were "confident about the safety issues involved, and [were] willing to treat groundwater from the Lowry Superfund site." (Metro's Vol. II, Ex. 54.) In conclusion, they stated they did not support OCAW's actions regarding Lowry and "[felt] that this issue [was] supportive of the personal agenda of Adrienne Anderson, and we do not wish to be associated with this fight, nor do we wish to fund this campaign with our union funds." (*Id.*) These employees also issued a letter to the editor of the Denver Rocky Mountain News expressing a similar sentiment. On December 20, 2000, a majority of the OCAW union members at Metro voted to de-certify OCAW as its collective bargaining agent.

## II. Procedural Background

On May 2, 1997, in response to receiving Chairman Plastino's April 16, 1997 letter threatening her with censure, Anderson filed a pro se complaint against Metro with the DOL alleging Metro retaliated against her for engaging in protected activities in violation of the employee protection provisions of seven environmental statutes: the Comprehensive Environmental Response, Compensation and Liability Act (CERCLA), the Solid Waste Disposal Act (SWDA), the Federal Water Pollution Control Act (FWPCA), the Energy Restoration Act of 1974 (ERA), the Safe Drinking Water Act (SDWA), the Clean Air Act (CAA) and the Toxic Substances

Control Act (TSCA). Specifically, she alleged Metro took the following actions against her in retaliation for her protected activities: (1) circulating to the Board Plastino's April 9, 1997 memorandum containing "unfounded accusations and insinuations of impropriety," (2) holding secret sessions of two of the Board's committees in her absence and without her knowledge, and (3) sending her the April 16, 1997 letter threatening her with censure. (Anderson's May 2, 1997 Complaint at 3.) She sought rescission of the "offending threats," declaratory relief, and "[a]ny other damages that may be related to this claim, in order to make [her] whole and protect [her] capacity to advocate for the workers [she] was designated to represent, as well as the wider public on environmental health and safety issues." (*Id.* at 4.)[31]

On June 6, 1997, David Decker, Regional Supervisory Investigator for the Occupational Safety and Health Administration of the DOL, upheld Anderson's claims under the whistleblower provisions of the CERCLA, FWPCA and SWDA but made no findings on her claims under the other statutes. Decker determined Metro had discriminated against Anderson by issuing "intimidating and threatening letters"

---

[31] In her formal statement of charges to Monica Oba, a DOL investigator, Anderson also complained concerning (1) Hackworth's accusations that she had lied at her confirmation hearing, (2) the Board's attempts to silence her at her first regular Board meeting, (3) Hackworth angrily ruling her out of order when she requested to go into executive session at her first Operations committee meeting, (4) the treatment she received at Gaetano's restaurant, (5) Plastino's telephone call raising other directors' concerns about her, and (6) the alleged altering of the Board's meeting minutes.

as a result of her "protected activities," failing to "accurately reflect concerns and comments made by [Anderson] in public records of meetings held by the Board," and refusing to "hear motions for amendments which [Anderson] made." (Letter from David Decker to Joel Moritz dated June 6, 19907 at 1.) Decker ordered Metro to publically rescind the April 16 and May 20, 1997 letters and to make clear in the public record that Metro and its Board cannot discriminate against employees and their representatives for participation in activities protected by the CERCLA, FWPCA and SWDA.

Both Metro and Anderson appealed. Anderson did not appeal OSHA's failure to make findings under the SDWA, CAA or TSCA but did appeal "the questions of remedy and relief" and the "denial" of her claim under the ERA. (Letter from Anderson to Chief ALJ dated June 12, 1997.) Metro appealed "[a]ll adverse findings and determinations." (Letter from Joel Moritz to Chief ALJ dated June 11, 1997.) The matter was referred to Administrative Law Judge (ALJ) Samuel J. Smith.

On appeal to ALJ Smith, Metro filed a Motion for Summary Decision, arguing Anderson lacked standing as an "authorized representative of employees" under the CERCLA, FWPCA and SWDA. Anderson opposed the motion.[32] In support of her

---

[32] Anderson retained counsel on August 5, 1997, and continues to be represented by an attorney.

standing as an "authorized representative of employees," she attached her own affidavit as well as affidavits from Ferrari and Holmstrom. On February 19, 1998, ALJ Smith granted Metro's motion. He concluded Anderson had failed to provide any evidence supporting her assertion she was the "authorized representative" of Metro employees or the OCAW. Specifically, he stated Anderson had produced no correspondence between herself and OCAW or the Mayor's office in support of her claimed representative status or any documentation establishing when and how she became an authorized representative. Anderson appealed to the Administrative Review Board (ARB).

On March 30, 2000, the ARB reversed ALJ Smith's decision and remanded the case for further proceedings. The ARB first addressed the meaning of "authorized representative" under the CERCLA, FWPCA and SWDA, determining it encompassed "any person requested by any employee or group of employees to speak or act for the employee or group of employees in matters within the coverage of the environmental whistleblower statutes . . . ." (ARB's May 30, 2000 Decision & Remand Order at 7-8.) It further stated that "an individual selected by a union representing employees covered by the whistleblower protection provisions to speak or act for the union (and by extension the employees) in matters within the purview of the environmental statutes . . . is also protected . . . ." (*Id.* at 8.) Based on the affidavits of Anderson, Ferrari and Holmstrom, the ARB determined there was a

-34-

genuine issue of material fact as to whether Anderson was an "authorized representative." Therefore, it remanded the case for a trial on the merits. As to the ERA, noting the difference between its statutory language and the other three statutes,[33] the ARB directed the parties on remand to brief, and the ALJ to resolve, whether Anderson fell within its coverage.

On remand, the case was assigned to ALJ David W. Di Nardi[34] and a seven day hearing was held on November 6-8 and 13-16, 2000. After the hearing, Anderson filed a second and third whistleblower complaint under all seven environmental statutes based on alleged retaliatory conduct occurring subsequent to the hearing. The second complaint, filed on December 15, 2000, alleged Metro "acted to remove [her] from the [Metro Board] as a workers' representative after [she] engaged in protected activity"[35] and "acted to defame [her] and . . . destroy [her] professional reputation in an organized campaign . . . to [Metro employees], members of the media, state and government officials, legislators and others."[36]

---

[33] As we discuss below, the ERA, unlike the CERCLA, SWDA, and FWPCA, limits relief to employees only.

[34] ALJ Smith had retired.

[35] This allegation was based on Hackworth's testimony at the hearing that he had expressed to someone in the Mayor's office that he hoped Anderson was not reappointed to the Board.

[36] In support of this allegation, Anderson points to a number of e-mails and documents in which Frank accuses Anderson of lying. She also points to his testimony that he provided a fact sheet to Denver Post editor Al Knight which

(Anderson's Dec. 15, 2000 Whistleblower Complaint at 2.) The third complaint, filed on January 5, 2001, asserted: (1) Frank falsely testified that Metro had not hired any outside public relations agent and that there were no statements concerning Anderson in the package of materials he submitted for an award he received from the Water Environment Federation (WEF), (2) Frank failed to produce several incriminating documents pursuant to Anderson's subpoena, (3) Metro altered its policy allowing access to its public records in direct response to and retaliation for Anderson's attempts to obtain health and safety information in 1999 and greatly restricted her ability to obtain information under CORA,[37] (4) Metro circulated false and defamatory materials concerning Anderson to its workers which resulted in OCAW employees denouncing their support for her in their April 26, 2000 letter

---

resulted in an article by Knight on Easter Sunday 1999. In this article, Knight states "Given Adrienne Anderson's record for accuracy it is a wonder that anyone still listens to this self-appointed 'environmental activist.'" (Anderson's Vol. III-A, Ex. 88.) Anderson claims Frank "set up" Knight to write this article. (Anderson's Vol. III-C, Anderson Aff. ¶ 62.) Anderson also claims Hackworth defamed her outside the Board, referring to his statement in a July 1997 Westward article that she is a "troublemaker" who "hurls charges without much validity." (Anderson's Vol III-A, Ex. 66.) Anderson alleges that despite not making a specific disclaimer in this article that he was not speaking on the Board's behalf, Hackworth was not censored or reprimanded by the Board.

[37] Anderson alleges Metro's new rules pertaining to public inspection of documents made it more difficult for her to obtain information by prohibiting the use of her own recording equipment, increasing the price of copies from 25 cents to $1.25 per page, restricting record review to Tuesdays and Thursdays, the days she teaches classes at the University of Colorado, and requiring her to be monitored during her review of documents.

which Anderson alleges Metro asked its employees to sign, and (5) Metro led an "award winning" campaign of libel and slander to the media, elected officials and others in an effort to destroy Anderson's credibility and professional reputation.[38] (Anderson's Jan. 5, 2001 Whistleblower Complaint at 2-3.) These two complaints were consolidated with her May 2, 1997 complaint.[39]

On September 18, 2001, ALJ Di Nardi issued a "Recommended Decision and Order" in favor of Anderson. As to her initial May 2, 1997 complaint, he determined Anderson was an "authorized representative" of Metro employees under the CERCLA, SWDA, and FWPCA and Metro had retaliated against her based on her protected activities.[40] He also determined her second and third whistleblower

---

[38] This allegation concerns the materials Frank submitted to the WEF, for which he won an award. Anderson asserts these materials included defamatory statements about her.

[39] ALJ Di Nardi allowed the parties to conduct additional discovery concerning Anderson's second and third whistleblower complaints. However, no additional hearing was held; all evidence concerning these additional complaints was presented via affidavits and deposition testimony.

[40] ALJ Di Nardi found Metro had taken the following adverse actions against Anderson based on her protected activities: "(a) cutting her off or ruling her out of order during Board meetings; (b) keeping her from voting on the Lowry settlement by delaying her confirmation by the City Council until June 1996; (c) ordering her off Metro property in March 2000 when she appeared for a press conference to voice her concerns about the Lowry settlement; (d) denying her requests to distribute material concerning the Lowry Landfill to the Metro Board or to put this issue on the Metro Board agenda; (e) denying her June 25, 1997 request for a special Board meeting to investigate public and worker health and safety concerns raised by Metro employees; (f) forcing her to make Open Records Act requests for information, and then charging her for such information; (g)

complaints were timely. In granting relief on the supplemental complaints, ALJ Di Nardi determined Anderson could sue under all seven environmental statutes. He concluded that despite the difference in statutory language between them, all seven statutes should be interpreted consistently to allow claims by employee representatives. Based on his finding of discrimination, ALJ Di Nardi ordered Metro to (1) expunge all negative references from Anderson's personnel file including the "highly threatening" April 16, 1997 letter from Plastino to Anderson, (2) cease and desist from retaliating against Anderson and its employees because of their protected activity, (3) provide a copy of the "Recommended Decision and Order" to a number of different agencies and individuals as well as post it on its website and in its facility, and (4) issue an apology to Anderson in a full page paid ad in the Denver Post. (ALJ Di Nardi's Sept. 18, 2001 Recommended Decision & Order at 77.) Additionally, he awarded Anderson $150,000 in compensatory damages, $150,000 in punitive damages (pursuant to 15 U.S.C. § 2622(b)(2)(B)(iv) (TSCA) and 42 U.S.C. § 300j-9(i)(2)(B)(ii)(IV) (SDWA)), and $125,000 for emotional distress. Metro appealed again to the ARB.

---

monitoring her activities and public statements; (h) circulating derogatory e-mails and other communications about her; (i) subjecting her, via an April 16, 1997 letter, to a special disclaimer requirement which was not imposed on other Board members, specifically Ted Hackworth; (j) communicating its desire to the Denver Mayor's office that she not be reappointed to the Metro Board, which resulted in her failure to be reappointed." (ALJ Di Nardi's Sept. 18, 2001 Recommended Decision & Order at 59.)

On May 29, 2003, the ARB issued its "Final Decision and Order," reversing ALJ Di Nardi's decision. It first concluded Anderson was not entitled to relief under the ERA, SDWA, CAA, and TSCA because, unlike the other three statutes, these statutes only provided a cause of action to employees not their authorized representatives.[41] As to the CERCLA, SWDA and FWPCA, the ARB determined Anderson had failed to prove she was an "authorized representative" of Metro employees and therefore, failed to establish a necessary element of her claim under the whistleblower statutes. This appeal followed.

III. Standard of Review

We review a decision by the ARB under the Administrative Procedure Act (APA), 5 U.S.C. §§ 701-706. *Trimmer v. United States Dep't of Labor*, 174 F.3d 1098, 1102 (10th Cir. 1999). Consequently, it will only be set aside if it is

---

[41] Despite recognizing that the statutory language of the SDWA, CAA, TSCA and ERA was similar and did not afford a separate cause of action to authorized representatives of employees, the ARB actually denied relief under the SDWA, CAA and TSCA because they "are not applicable to the facts in this case." (ARB's May 29, 2003 Final Decision & Order at 8.) By this statement, it appears the ARB believed the SDWA, CAA and TSCA were no longer at issue in the case because Anderson had not appealed Decker's initial failure to make findings regarding them. Indeed, Anderson's brief to the ARB was misleading. On page six of her brief, Anderson states she seeks relief on appeal under the CERCLA, SWDA, FWPCA and ERA. However, on page thirty-seven, she seeks punitive damages under the SDWA and TSCA. It appears that despite any statements to the contrary in her brief, Anderson's appeal to the ARB involved all seven environmental statutes. Nevertheless, the ARB did hold that the SDWA, CAA and TSCA, like the ERA, did not provide whistleblower protection to non-employees.

-39-

"arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). The ARB's factual determinations will only be set aside if they are not supported by substantial evidence. § 706(2)(E). "Substantial evidence is such relevant evidence a reasonable person would deem adequate to support the ultimate conclusion." *Grubb v. F.D.I.C.*, 34 F.3d 956, 961 (10th Cir. 1994). We review matters of law de novo, providing *Chevron* deference to the ARB's construction of the environmental whistleblower statutes. *Trimmer*, 174 F.3d at 1102.

Under *Chevron*, we must first ask whether Congress has directly spoken to the precise question at issue. *Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 842 (1984). "If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Id.* at 842-43. If we determine Congress has not directly spoken on the precise question at issue, i.e. the statute is silent or ambiguous, we do not simply impose our own construction on the statute, but rather, we must ascertain whether the agency's interpretation is a permissible construction of the statute. *Id.* at 843.

IV. Discussion

Before addressing the merits of this case, we must first decide whether Anderson has waived her claims under the ERA, SDWA, CAA and TSCA. In her

opening brief, Anderson expressly states in a footnote that she is seeking relief on appeal under the CERCLA, SWDA, FWPCA and ERA. Although she includes the ERA in this footnote, she fails to assert any argument concerning the ARB II panel's[42] determination that the ERA only provides a cause of action to employees. Based on these deficiencies, Metro argues Anderson has waived her claims under the ERA, SDWA, CAA and TSCA.

After filing her opening brief, Anderson obtained new counsel. Her current counsel has filed a Motion to Correct and/or Clarify Opening Brief on her behalf. In this motion, Anderson contends her former counsel inadvertently omitted the SDWA, CAA and TSCA and she never intended to waive the relief she was awarded by ALJ Di Nardi under those statutes. She asserts this is evident in the conclusion of her opening brief in which she requests affirmance of ALJ Di Nardi's decision "in its entirety." (Anderson's Amended Opening Br. at 29.) Anderson also points out that none of the issue statements in her opening brief mention any particular statute and because the scope of all seven environmental statutes is the same, her arguments apply to them all. Lastly, as to her claims under the ERA, Anderson maintains she did not waive them because she specifically stated in her opening

_____

[42] Because there were two ARB panels involved in this case, we will refer to the ARB panel which issued the March 30, 2000 "Decision and Remand Order" as "ARB I" or the "ARB I panel" and the ARB panel which issued the May 29, 2003 "Final Decision and Order" as "ARB II" or the "ARB II panel."

-41-

brief she was seeking relief under the ERA and that the ARB II's decision concerning the ERA was erroneous.

Metro opposes Anderson's motion.[43]  It notes: (1) citations to the SDWA, CAA and TSCA were not only omitted from Anderson's opening brief but also from the jurisdictional statement of her docketing statement and her statement of issues, (2) because the ARB II panel's denial of relief under the ERA, SDWA, CAA and TSCA was based on a different ground than its denial under the other three statutes, Anderson's former counsel apparently made a strategic decision not to appeal under the ERA, SDWA, CAA and TSCA, and (3) although Anderson raises the ERA in her opening brief, she fails to identify as an issue or to even superficially challenge the ARB II's decision that the ERA does not provide a cause of action to employee representatives.

The failure to raise an issue in an opening brief waives that issue. *State Farm Fire & Cas. Co. v. Mhoon*, 31 F.3d 979, 984 n.7 (10th Cir. 1994).  "An issue not included in either the docketing statement or the statement of issues in the party's initial brief is waived on appeal." *Adams-Arapahoe Joint Sch. Dist. No. 28-J v. Continental Ins. Co.*, 891 F.2d 772, 776 (10th Cir. 1989).  Consistent with these principles is the general rule that "appellate courts will not entertain issues raised

_____

[43] The Secretary of the DOL also filed a brief in this appeal.  However, because its position essentially mirrors that of Metro, we will refer to Metro only.

for the first time on appeal in an appellant's reply [brief]." *Headrick v. Rockwell Int'l Corp.*, 24 F.3d 1272, 1277-78 (10th Cir. 1994). The reasons for this rule are plain:

> It robs the appellee of the opportunity to demonstrate that the record does not support an appellant's factual assertions and to present an analysis of the pertinent legal precedent that may compel a contrary result. The rule also protects this court from publishing an erroneous opinion because we did not have the benefit of the appellee's response.

*Stump v. Gates*, 211 F.3d 527, 533 (10th Cir. 2000) (citation omitted). Nevertheless, there are "circumstances in which a court may consider, or even raise *sua sponte*, arguments ignored or left undeveloped by counsel in the first round of briefing." *Herbert v. National Acad. of Sciences*, 974 F.2d 192, 196 (D.C. Cir. 1992); *see also Headrick*, 24 F.3d at 1278. For example, we are always obligated to consider our jurisdiction, regardless of whether or when the parties raise it. *Herbert*, 974 F.2d at 196.

Here, despite Anderson's failure to address the SDWA, CAA or TSCA or to present any argument concerning the ERA in her opening brief, we will consider these statutes on appeal, specifically, whether the ARB II panel erred in determining they only provide relief to employees, not their authorized representatives. In doing so, the reasons for our waiver rule will not be defeated. The parties adequately briefed this issue during the administrative proceedings; thus, we have the benefit of both parties' position on the issue. The issue was also addressed by both ALJ Di

-43-

Nardi and the ARB II panel. Further, because we agree with Metro that these statutes only provide a remedy to employees, which we discuss next, Metro will not be prejudiced.[44]

*A. Whether Anderson can proceed under the ERA, SDWA, CAA, TSCA*

Before discussing whether Anderson can proceed under the ERA, SDWA, CAA and TSCA, we pause briefly to address what we are not deciding in this case. We are not deciding the propriety of Metro's agreement to treat the Lowry effluent or whether there is plutonium or other radionuclides present in the Lowry waste stream. Our task is limited to ascertaining whether Anderson, as a Board director, can proceed under the employee protection provisions of the environmental statutes. We start with the ERA, SDWA, CAA and TSCA.

The employee protection provision of these statutes provide:

> No employer may discharge *any employee* or otherwise discriminate against *any employee* with respect to [his or her] compensation, terms, conditions, or privileges of employment because *the employee (or any person acting pursuant to a request of the employee)* [engaged in protected activity].

*See* 15 U.S.C. § 2622(a)(TSCA); 42 U.S.C. §§ 300j-9(i)(1) (SDWA), 5851(a)(1) (ERA), 7622(a) (CAA) (emphasis added). In contrast, the same provision under the CERCLA, SWDA and FWPCA provide:

---

[44] Consequently, we grant Anderson's Motion to Correct and/or Clarify Opening Brief and deny Metro's Motion to Strike Anderson's Reply Brief or in the Alternative to File a Sur-Reply.

No person shall fire, or in any other way discriminate against, or cause to be fired or discriminated against, *any employee or any authorized representative of employees* by reason of the fact that *such employee or representative* [engaged in protected action under this statute].

*See* 33 U.S.C. § 1367(a) (FWPCA); 42 U.S.C. §§ 6971(a) (SWDA), 9610(a) (CERCLA) (emphasis added).  The remedial provisions of the seven statutes are also dissimilar.  While the CERCLA, SWDA and FWPCA provide a remedy for either an employee or an employee's representative,[45] the ERA, SDWA, CAA and TSCA expressly provide a remedy only to an employee.[46]

Although recognizing the difference in their statutory language, ALJ Di Nardi nevertheless concluded Anderson was covered under all seven environmental

---

[45]  These statutes provide:

*Any employee or a representative of employees* who believes that he has been fired or otherwise discriminated against by any person in violation of subsection (a) of this section may . . . apply to the Secretary of Labor for a review of such firing or alleged discrimination. . . .

*See* 33 U.S.C. § 1367(b) (FWPCA); 42 U.S.C. §§ 6971(b) (SWDA), 9610(b) (CERCLA) (emphasis added).

[46] These statutes state:

*Any employee* who believes that [he or she] has been discharged or otherwise discriminated against by any person . . . may . . . file (or have any person file on his behalf) a complaint with the Secretary of Labor. . . alleging such discharge or discrimination . . . .

*See* 15 U.S.C. § 2622(b)(1) (TSCA); 42 U.S.C. §§ 300j-9(i)(2)(A) (SDWA), 5851(b)(1) (ERA), 7622(b)(1) (CAA) (emphasis added).

statutes. He determined all seven statutes should be interpreted consistently based on (1) Congress' intent to protect employee representatives, (2) the legislative history, and (3) the fact the DOL has administered and interpreted all seven statutes through a single uniform body of regulations, specifically, 29 C.F.R. Part 24. Therefore, he concluded the language "any person acting pursuant to a request of the employee" in the ERA, SDWA, CAA and TSCA should be construed to allow claims by employee representatives. The ARB II panel disagreed. Relying on the plain meaning of the statutory language, it concluded that even if "any person acting pursuant to a request of the employee" has the same meaning as "authorized representative," the ERA, SDWA, CAA and TSCA do not provide a cause of action for "any person acting pursuant to a request of the employee" but rather only to the employee. Therefore, it determined "Congress must have intended that only employees would be entitled to file a claim" under these statutes. (ARB's May 29, 2003 Final Decision & Order at 8.) Consequently, it concluded Anderson was precluded from seeking relief under these statutes.

In her reply brief, Anderson advocates ALJ Di Nardi's position. She claims that while the standing provisions of the ERA, SDWA, CAA and TSPA are different from those contained in the CERCLA, SWDA and FWPCA, the legislative purpose behind each is the same and thus all seven statutes should be construed consistently to permit employee representatives to seek protection under them. She alleges the

ARB II's decision to the contrary is unreasonable given the remedial purpose of these statutes and the DOL's singular uniform body of regulations implementing them. Although Metro did not address this issue in its responsive brief (due to Anderson's failure to raise it in her opening brief), its position is no mystery given its briefing during the administrative proceedings. It contends the statutory language and legislative history of the ERA, SDWA, CAA and TSPA demonstrate that employee representatives are not protected under these acts. Additionally, it asserts that because of the significantly different language between these statutes and the CERCLA, SWDA and FWPCA, it is clear Congress intended them to have different meaning.

"Our analysis of statutory construction must begin with the language of the statute itself, and [absent] a clearly expressed legislative intention to the contrary, that language must ordinarily be regarded as conclusive." *NISH v. Rumsfeld*, 348 F.3d 1263, 1268 (10th Cir. 2003) (citations and quotations omitted).

> As in all statutory construction cases, we begin with the language of the statute. If the statutory language is not ambiguous, and the statutory scheme is coherent and consistent, further inquiry is unneeded. The plainness or ambiguity of statutory language is determined by reference to the language itself, the specific context in which that language is used, and the broader context of the statute as a whole.

*In re Wise*, 346 F.3d 1239, 1241 (10th Cir. 2003) (citations and quotations omitted). *See also Connecticut Nat'l Bank v. Germain*, 503 U.S. 249, 253-54 (1992) ("[C]ourts must presume that a legislature says in a statute what it means and means

in a statute what it says there.").

Here, the plain language of the ERA, SDWA, CAA and TSCA is clear – while the ERA, SDWA, CAA and TSCA prohibit discrimination based on an employee's or his representative's protected activity, the discrimination must be directed toward the employee and it is the employee, not his representative, which is clothed with a cause of action for that discrimination. Anderson was not Metro's employee. [47] Therefore, further inquiry is inappropriate. Moreover, "[w]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *Russello v. United States*, 464 U.S. 16, 23 (1983) (quotations omitted). Although this rule does not strictly apply here because the seven whistleblower statutes are not all part of the same Act, its reasoning is instructive. Based on the language of the CERCLA, SWDA, and FWPCA, Congress knew how to provide whistleblower protection to employees and "authorized representatives of employees." Therefore, the absence of such similar language in the other four statutes is telling.

In concluding Anderson was covered under the ERA, SDWA, TSCA and CAA, ALJ Di Nardi relied in part on the uniform regulations applicable to all seven

---

[47] Anderson argued to the ARB II panel she was Metro's "employee." The ARB II rejected this argument, noting it was in direct conflict with previous concessions Anderson made. Anderson has not repeated this argument on appeal.

statutes. Although this is true, *see* 29 C.F.R. § 24.1(a), (b), [48] the regulations only proscribe discrimination against an employee, § 24.2(a), and only confer a cause of action for such discrimination on the employee. *See* § 24.3(a) (" *[A]n employee* who believes he or she has been discriminated against by an employer . . . may file, or have another person file on his or her behalf, a complaint . . . .") (emphasis added). Indeed, the regulations substantially mirror the language of the ERA, SDWA, CAA and TSCA. Therefore, the mere fact one set of implementing regulations applies to all seven statutes does not override the plain language of the ERA, SDWA, TSCA and CAA which provides relief only to employees.

Based on the above, we affirm the ARB II's determination that Anderson cannot proceed under the ERA, SDWA, TSCA or CAA. We now turn to whether Anderson was an "authorized representative of employees" under the CERCLA, SWDA, and FWPCA while serving as a director on Metro's Board.

---

[48] 29 C.F.R. § 24.1(a), (b) provides:

(a) This part implements the several employee protection provisions for which the Secretary of Labor has been given responsibility pursuant to the following Federal statutes: [SDWA, FWPCA, TSCA, SWDA, CAA, ERA and CERCLA].

(b) Procedures are established by this part pursuant to the Federal statutory provisions listed in paragraph (a) of this section, for the expeditious handling of complaints by employees, or persons acting on their behalf, of discriminatory action by employers.

*B. Whether Anderson is an "authorized representative of employees" under CERCLA, SWDA, and FWPCA*

In order to establish a prima facie claim of discrimination under the employee protection provisions of the CERCLA, SWDA and FWPCA, Anderson must show: (1) she is an employee or authorized representative of employees, (2) she engaged in protected activity; (3) Metro knew of the protected conduct; (4) the alleged discrimination occurred; and (5) a nexus exists making it likely that the protected activity led to the alleged discrimination. *See Simon v. Simmons Foods, Inc.*, 49 F.3d 386, 389 (8th Cir. 1995). Applying the parameters set forth by the ARB I panel to the term "authorized representative of employees," the ARB II panel concluded Anderson failed to prove she was an "authorized representative" of Metro employees or OCAW and therefore, failed to establish an essential element of her claim under the CERCLA, SWDA, and FWPCA.

In reaching this decision, the ARB II panel first determined Anderson could not, as a matter of law, "represent" employees as a Board director because (1) the Colorado statutes governing Metro only authorize directors to represent the citizens of the appointing municipality, not a particular interest group or segment of society, (2) Metro's by-laws, which define the duties of a director, do not refer to a director's representation of employees and specifically require a director's recusal on matters in which the director has a personal or private interest, thereby strongly indicating that a director may not serve two masters, and (3) Mayor Webb appointed

-50-

Anderson to serve on the Board as the City of Denver's representative and his motivation for the appointment did not confer on her the legal authority to act as an authorized representative of employees. The ARB II panel further concluded Anderson did not establish by a preponderance of the evidence that Metro employees or OCAW officials "authorized" her to be their representative during her tenure on the Board. It found "Anderson was, at best, self-authorized." (ARB May 29, 2003 Final Decision & Order at 13.) It also discounted the testimony of Ferrari, Farmer, Holmstrom and other individuals associated with OCAW that Anderson was the OCAW's or its employees' representative, concluding that "none of [these individuals'] personal states of mind conferred any authority on Anderson to be OCAW's authorized representative." ( *Id.* at 16.) In conclusion, the ARB II stated: "[T]he union's wishes and public perceptions did not confer 'authorized representative' status [on Anderson], any more than one's affinity for political discourse makes one an official representative of a particular point of view or being sympathetic to a particular point of view gives the sympathizer the authority to act as an agent for one similarly inclined." ( *Id.* at 17-18.)

Anderson challenges the ARB II panel's decision in several respects. First, she asserts that by requiring "legal" authority, rather than merely a simple request by employees to represent them, the ARB II's decision was unduly narrow, thereby violating the broad remedial purposes of the statutes and directly conflicting with

-51-

the ARB I panel's construction of the term "authorized representative of employees." Anderson further maintains that nothing in the Colorado statutes or Metro's by-laws prohibited her from representing workers' interests while serving as a director. Lastly, she asserts the evidence clearly established that individual Metro employees, groups of Metro employees and OCAW repeatedly requested her to speak and act on their behalf concerning environmental, public and worker safety issues. Therefore, she contends the ARB II's decision to the contrary is not supported by substantial evidence.

Metro argues we should affirm the ARB II's decision in its entirety. While conceding that directors may presumably advocate on behalf of a particular interest, Metro contends the Colorado statutes and Metro by-laws clearly provide that Board directors are representatives of the citizens of their appointing municipality. It contends the mere fact Anderson was sympathetic to OCAW's position and may have harbored labor-friendly views did not make her OCAW's "authorized representative" any more than a United States Senator endorsed by the AFL-CIO is that union's representative. Metro further maintains that substantial evidence supports the ARB II's decision that Anderson failed to prove she was an "authorized representative" of Metro employees or OCAW. It points out that no documentation from the OCAW identifying her as its representative exists and none of the communications from OCAW officials to Metro or the public refer to Anderson as

OCAW's representative. Metro also contends the ARB I panel's decision is irrelevant because it is the ARB II decision which is being reviewed and in any event, the two decisions are not inconsistent. Lastly, Metro asserts Anderson's whistleblower complaints merely represent the friction that existed between her and her fellow Board members who held contrary views. It maintains the environmental whistleblower statutes were not intended to encompass claims by political appointees challenging discord in the legislative and policy-making process.

Before we can determine whether the ARB II panel correctly found that Anderson was not an "authorized representative of employees," we must first define that term. The statutes and implementing regulations do not define the term nor does case law provide any guidance. Below, the ARB II panel relied on the ARB I panel's interpretation of "authorized representative." The ARB I panel examined not only the statutes' plain language but also their legislative history. Because the legislative history of the FWPCA (the forerunner of the environmental whistleblower statutes) indicated its employee protection provision was patterned after the National Labor Management Act (NLMA) and a similar provision in the Coal Mine Health and Safety Act (CMHSA), *see* S. REP. NO. 92-414 (1971), *reprinted in* 1972 U.S.C.C.A.N. 3668, 3748, the ARB I panel began its analysis with these statutes. The NLMA's employee protection provision (29 U.S.C. § 158(a)(4)) does not include the phrase "authorized representative of employees."

Consequently, the ARB I panel turned to the CMHSA's employee protection provision (which did prohibit discrimination against "any authorized representative of miners") and its legislative history. [49] This history explained the meaning of "representative of the miners" as including "any individual or organization that represents any group of miners at a given mine [and] does not require that the representative be a recognized representative under other labor laws." CONF. REP. NO. 91-761 (1969), *reprinted in* 1969 U.S.C.C.A.N. 2578, 2582. Relying on this definition and the remedial nature of the environmental whistleblower statutes, the ARB I panel concluded "authorized representative of employees" under the CERCLA, SWDA and FWPCA should be given a comparably broad meaning. Therefore, it concluded Anderson was an "authorized representative of employees" if a Metro employee, group of Metro employees or a union requested or selected her to speak or act for the employee, group of employees or union within the purview of the CERCLA, SWDA or FWPCA. Although the ARB II relied on the ARB I's

---

[49] The ARB I panel relied on the CMHSA as it existed when it was first enacted in 1969. *See* Federal Coal Mine Health and Safety Act of 1969, Pub. L. No. 91-173, § 110(b)(1), 1969 U.S.C.C.A.N. 823, 841. The current version of the employee protection provision of the CMHSA does not contain the word "authorized." *See* 30 U.S.C. § 815(c)(1), (2). Its implementing regulations, however, define "representative of miners" as including "[r]epresentatives authorized by the miners, miners or their representative, authorized miner representative, and other similar terms as they appear in the act." 30 C.F.R. § 40.1(b)(2).

construction of "authorized representative," it focused on the word "selection," concluding that the ARB I's use of this word suggested there must be some tangible act of selection by employees in order for one to be an "authorized representative of employees."

In reviewing the ARB II's [50] construction of the term "authorized representative of employees," our first step under *Chevron* is to determine whether Congress' intent is clear; if so, we must give effect to that intent. *Chevron*, 467 U.S. at 842-43. To determine whether Congress had an intent on the precise question at issue, courts utilize the traditional tools of statutory construction, including the statutory language and legislative history. *Id.* at 843 n.9; *see also State of Utah v. Babbitt*, 53 F.3d 1145, 1148 (10th Cir. 1995). Here, the plain meaning of "authorized" is "1: [gave] authority to: empower[ed][;] 2: [gave] legal or official approval to . . .[;] 3: [established] by or as if by authority: sanction[ed]." WEBSTER'S COLLEGE DICTIONARY 59 (2003). Black's Law Dictionary defines it as: "1. [gave] legal authority; . . . empower[ed] . . . 2. [] formally approve[d]; . . .

---

[50] Anderson argues *inter alia* that the ARB II's decision should be reversed because its construction of "authorized representative" directly conflicts with the ARB I panel's construction of that term, thereby implying it violates the law of the case doctrine. However, our review is of the ARB II's decision and therefore, its construction of the term is the one we examine. Additionally, we have found no cases applying the law of the case doctrine between administrative courts. In any event, the ARB II reasonably construed the ARB I's use of the word selection as requiring some tangible act of selection.

sanction[ed] . . . ." B LACK'S LAW DICTIONARY 129 (7th ed. 1999). The plain meaning of "representative" is "standing or acting for another especially through delegated authority . . . ." W EBSTER'S COLLEGE DICTIONARY 762 (2003). Black's Law Dictionary defines it as "[o]ne who stands for or acts on behalf of another. . . ." BLACK'S LAW DICTIONARY 1304 (7th ed. 1999). Therefore, based solely on the statutory language used, the term "authorized representative" appears to require some sort of tangible delegation to act in one's shoes.

We next turn to the legislative history. The legislative history of the FWPCA, the forerunner of the CERCLA and SWDA, states the purpose of its employee protection provision was to "offer[] protection *to employees* who believe they have been fired or discriminated against as a result of the fact they have testified or brought suit under [the FWPCA]." S. R EP. N O. 92-414 (1971), *reprinted in* 1972 U.S.C.C.A.N. 3668, 3748 (emphasis added). It further provides:

> [The employee protection provision was] patterned after the [NLMA] and a similar provision in Public Law 91-173 [the CMHSA of 1969] . . . . . Under this section *employees and union officials* could help assure that employers do not contribute to the degradation of our environment. *Any worker* who is called upon to testify or who gives information with respect to an alleged violation of a pollution control law by his employer or who files or institutes any proceeding to enforce a pollution control law against an employer may be subject to discrimination. The section would prohibit any firing or discrimination and would provide an administrative procedure under which the *employee or his representative* could seek redress for any violation of this prohibition. . . .

*Id.* (emphasis added).

-56-

The employee protection provision of the CMHSA of 1969 (Public Law 91-173) prohibited discrimination against "any miner or any authorized representative of miners" and provided a remedy for "any miner or a representative of miners." *See* Federal Coal Mine Health and Safety Act of 1969, Pub. L. No. 91-173, § 110(b)(1), (2), 1969 U.S.C.C.A.N. 823, 841. Its legislative history defined "representative of miners" as including "any individual or organization that represents any group of miners at a given mine [and] does not require that the representative be a recognized representative under other labor laws." CONF. REP. NO. 91-761 (1969), *reprinted in* 1969 U.S.C.C.A.N. 2578, 2582. The NLMA contains a provision describing unfair labor practices by an employer. One such practice is "to discharge or otherwise discriminate against *an employee* because he has filed charges or given testimony . . . ." 29 U.S.C. § 158(a)(4) (emphasis added). Its definitions section defines "representatives" as "includ[ing] any individual or labor organization." 29 U.S.C. § 152(4).

Unlike the ARB I panel, we find the legislative history not particularly helpful in ascertaining Congress' intent. Although the CMHSA of 1969 utilized the term "authorized representative of miners," its legislative history only defined "representative of the miners." Additionally, the NLMA does not prohibit discrimination against employee representatives and its definition of "representative" does not include the word "authorized."

Based on the above, although the plain meaning of the words provides some guidance, we conclude Congress' intent in using the term "authorized representative" is far from clear. For instance, even applying the plain meaning of the terms, Congress could have intended to protect only individuals employed by a union or those individuals under contract to represent an employee or group of employees, i.e. an attorney or union. Therefore, under *Chevron*, our inquiry becomes whether the ARB II's construction of "authorized representative" is a permissible one. Under this standard, "[t]he agency's interpretation need not be the only one it could have adopted, or the one that this court would have reached had the question initially arisen in a judicial proceeding." *See Salt Lake City v. Western Area Power Admin.*, 926 F.2d 974, 978 (10th Cir. 1991). Based on the statutory language and the legislative history of the statutes, we conclude the ARB II's construction of "authorized representative" to require some sort of tangible act of selection is a permissible one.

We now turn to the ARB II's conclusion that Anderson failed to show she was an "authorized representative of employees" while serving as a Board director.[51] As stated previously, the ARB II panel's decision contained a legal and factual

---

[51] In her reply brief, Anderson argues for the first time that even if she was not an "authorized representative" while a director, she was such representative after she was "removed" from the Board in June 1998. Due to her failure to raise this argument in her opening brief, we consider it waived. *State Farm Fire & Cas. Co.*, 31 F.3d at 984 n.7.

component. Therefore, under the APA, our review of the legal issue is de novo; we review its factual findings to determine whether they are supported by substantial evidence. *Trimmer*, 174 F.3d at 1102 (citing 5 U.S.C. § 706(2)).

We agree with the ARB II that as a Board director, Anderson could not, as a matter of law, "represent" Metro employees or OCAW because she was legally required to represent the citizens of Denver, not any particular segment of society or a particular interest group. We further agree that any political motivation behind her appointment to the Board is irrelevant. We also conclude the ARB II's factual conclusion that Anderson failed to prove she was "authorized" to represent Metro employees or OCAW while on the Board is supported by substantial evidence. As the ARB II stated, Anderson's evidence of authorization amounted to self-authorization at best. Additionally, none of the individuals who testified in favor of Anderson's alleged "authorized representative" status could point to any documentation placing Metro on notice that Anderson's appointment to the Board was any different than any other director's appointment. Indeed, Anderson testified there was none. Merely seeking a director sympathetic to one's views is insufficient to demonstrate a delegation of representative authority. [52]

In addition to the ARB II's well-reasoned conclusions, the nature of

_____

[52] We express no opinion as to whether a letter, similar to the one Ferrari sent Mayor Webb seeking Anderson's appointment to the Board, would be sufficient in a different context to authorize an individual to represent employees.

Anderson's complaints demonstrate she is not entitled to protection under the environmental whistleblower statutes. Anderson claims *inter alia* that Metro discriminated against her by cutting her off or ruling her out of order at meetings, denying her requests to distribute material and for a special Board meeting, subjecting her to a special disclaimer requirement when making public statements and threatening her with censure if she did not do so, omitting allegedly relevant actions in Board meeting minutes, seeking that she not be reappointed to the Board, and defending its position on Lowry to the media and public, which included defaming her and destroying her personal reputation. We have difficulty understanding how those complaints amount to "discrimination" from which these statutes afford protection. While frustrating and unpleasant, the matters about which she complains appear to be part of the rough and tumble of politics and the by-product of a minority position on a political board.

A political remedy is best suited to a political wrong. The political process brought Anderson to the Board and she obviously understands its role in board dynamics and decision-making. In concert with others she publically advocated her position, advertised her disagreement with past decisions, and made her differences with the Board a matter of public debate. Clearly, she hoped to rally public opinion to her point of view and thereby influence the Board's decisions. Just as clearly, that is her right. Public service should encourage, not muzzle, public debate. On

the other hand, Anderson should not have been surprised when bare knuckles were met with bare knuckles. And when the gloves came off bloody knuckles as well as bloody noses were exposed to public view and comment. Her claims that she suffered disparate, even disparaging, treatment was rightfully part of her very public campaign to win the hearts and minds of the greater Denver citizenry. [53] But it does not follow that her political wounds need be met with healing balm in this forum.

She has pointed to no case, and we can find none, layering whistle-blower protections on an overtly political process such as this. That is not surprising. Selectively providing the insulating blanket of whistle-blower protection to one political appointee on a public board might well disadvantage other board members and alter group dynamics; assuredly it would impact the Board's decision-making process. Anderson might embrace that as wholesome. But fairness, like beauty, is often a matter of perspective.

Our detailed review of the record reveals Anderson's perspective to be quite narrow. While complaining that Metro made defamatory remarks against her, she

---

[53] For example, in the article "Radioactive Sludge," which was published April 26, 1997, in In These Times, Anderson is quoted as saying: "I was chided for informing workers at Metro about the plan. . . . The board chairman told me that there were board members who thought I was being devious for looking into this issue." (Anderson's Vol. III-A, Ex. 51 at 1-2 (quotations omitted)). Additionally, in the article "Sister Sludge," which appeared in the Westward on July 24, 1997, Anderson is quoted as follows: "[Metro] is a cesspool of threats and intimidation. . . . [It] launched a defamation campaign to portray me as a wacko." (*Id.*, Ex. 66 (quotations omitted)).

fails to acknowledge her own statements to the media accusing Hite of lying and describing Metro as a "cesspool of threats and intimidation." (Anderson's Vol. III-A, Ex. 66.) Apparently, Anderson believes Metro should have just sat back and allowed her to make such statements without defending itself, in particular its position on Lowry. This skewed perspective is readily apparent from Anderson's April 20, 2001 deposition, where the following exchange occurred between Metro's counsel and Anderson:

> Q.    Before we broke for lunch, you talked about Mr. [Frank's] references . . . to you as a dissident board member, and he also said that you weren't telling the truth. Do you recall that testimony?
>
> . . .
>
> A.    Yes.
>
> Q.    And you seem offended by that.
>
> A.    Yes.
>
> Q.    In the "Sister Sludge" article . . . you say that Marc Herman [from the EPA] is lying in an effort to save the government money. Did you tell that to [the author]?
>
> A.    Yes, I did.
>
> Q.    Is that defamation?
>
> A.    No.
>
> Q.    Because you're telling the truth, aren't you?
>
> A.    Yes, and he is not.

(Anderson's Apr. 20, 2001 Depo. at 74-75.)

The essence of Anderson's complaints is that the Board would not listen to her. However, the record demonstrates numerous instances where Anderson was given the opportunity to be heard by the Board. For instance, Anderson was allowed to be heard at the December 1996 Operations committee meeting in which she informed the committee that she would be speaking out against Metro's treatment of the Lowry effluent. She was also allowed to speak against Plastino's proposed resolution at the April 15, 1997 Board meeting. Additionally, Anderson's request for a special Board meeting was mailed to all directors and she frequently distributed materials to directors at meetings. Anderson was also allowed to be heard at the August 1997 Operations committee meeting concerning alleged omissions in the committee meeting minutes and the propriety of tape-recording the meetings. She was permitted to speak out against the Lowry settlement at the June 17 and July 15, 1997 meetings and again at the November 18, 1997 and June 16, 1998 meetings, where she voiced her concerns that Metro's treatment of the Lowry effluent would affect the quality of its bio-solids. Moreover, Anderson was always allowed to vote "no" on any issue before the Board with which she disagreed and she exercised this right on a number of occasions. With boundless energy, and enthusiasm to match, Anderson appears to believe that one who listens carefully will not only hear, but also heed, her words. Her unbridled zeal demands attention without regard to correlative rights; one board member's right to speak is no more potent than another

member's right to lend a deaf ear.

The ARB II panel correctly concluded Anderson lacked standing to sue under the CERLCA, SWDA, and FWPCA.

## V.  Conclusion

We GRANT Anderson's Motion to Correct and/or Clarify Opening Brief and the Secretary of Labor's unopposed Motion to Supplement the Record.  Concluding Anderson has no standing to pursue her whistleblower complaints under the CERCLA, SWDA, FWPCA, ERA, SDWA, CAA and TSCA, we AFFIRM the ARB II panel's May 29, 2003 Final Decision and Order in its entirety.  Based on this conclusion and finding no prejudice to Metro, we DENY Metro's Motion to Strike Anderson's Reply Brief or in the Alternative to File a Sur-Reply.